RENDERED: AUGUST 29, 2019
TO BE PUBLISHED

# $\mathfrak{Supreme\ Court\ of\ Kentucky}$ FINAL



DATE 10/31/19 JM

2018-SC-000122-TG

WILLIAM M. LANDRUM III, IN HIS           APPELLANT
OFFICIAL CAPACITY AS SECRETARY OF
THE FINANCE AND ADMINISTRATION
CABINET

ON TRANSFER FROM COURT OF APPEALS
V.               CASE NO. 2018-CA-00352
FRANKLIN CIRCUIT COURT NO. 18-CI-00043

COMMONWEALTH OF KENTUCKY EX.          APPELLEE
REL. ANDY BESHEAR, ATTORNEY
GENERAL AND ANDY BESHEAR IN HIS
OFFICIAL CAPACITY AS ATTORNEY
GENERAL FOR THE COMMONWEALTH OF
KENTUCKY

**OPINION OF THE COURT BY CHIEF JUSTICE MINTON**

**<u>REVERSING</u>**

The Office of the Attorney General ("OAG") contracted on a contingency-fee basis with a team of law firms led by Morgan & Morgan to conduct investigation into and commence litigation on potential statutory violations arising out of the manufacturing, distribution, and dispensing of prescription opioid products within the Commonwealth. The Government Contract Review Committee ("Committee") of the Legislative Research Commission ("LRC") recommended that Secretary of the Finance and Administration Cabinet

("Cabinet") William Landrum disapprove and cancel the contract. And Secretary Landrum ultimately did as the Committee recommended.

Asserting the right—free of the Committee's and Secretary Landrum's interference—to contract with outside counsel on a contingency-fee basis, the OAG brought this declaratory-judgment action in Franklin Circuit Court to vindicate this asserted right. Finding that the OAG is subject to the contracting-oversight requirements of the Model Procurement Code ("MPC")[1] and that the Committee and Secretary Landrum did not act inappropriately by disapproving and ultimately canceling the contract, we find in favor of Secretary Landrum. Accordingly, we reverse the judgment of the Franklin Circuit Court and remand this case to that court with direction to enter judgment in favor of Secretary Landrum.

## I. BACKGROUND.

In June 2017, the OAG sought to contract with outside counsel on a contingency-fee basis to investigate and litigate potential violations of state consumer-protection, Medicaid, antitrust, and other statutes in the manufacturing, distribution, and dispensing of prescription opioid products within the Commonwealth. Out of the seventeen law firms submitting proposals, the OAG review panel decided to contract with a team of law firms and attorneys led by Morgan & Morgan.[2]

---

[1] Kentucky Revised Statutes ("KRS") 45A.005, et seq.

[2] The OAG review panel considered a variety of factors, ranging from the skill of the law firm to the law firm's contingency-fee schedule bid, in deciding to award the contingency-fee contract to the Morgan & Morgan team.

2

The OAG prepared its contract with the Morgan & Morgan team and submitted it to the Cabinet on September 21, 2017. On October 31, 2017, the Cabinet responded, rejecting the proposed contract. The Cabinet explained that the contract should include additional language requiring that any funds produced under the contract must first be paid in full to the State Treasurer before the contingent fee would be distributed to counsel. On November 2, 2017, the Cabinet proposed language to address these concerns. The OAG added this language and submitted the revised contract on November 14, 2017. On December 13, 2017, the Cabinet notified the OAG that it disapproved the added language and rejected the revised contract. The OAG revised the contract again and submitted a third version. The Cabinet ultimately approved the contract on December 21, 2017.

The Cabinet then submitted the contract to the Committee. The Committee held a meeting to review it on January 9, 2018. The Committee voted to disapprove the contract and informed Secretary Landrum of this decision in a letter dated January 10, 2018. In the letter, the LRC explained the reason for its recommended disapproval of the contract: "The committee is concerned, in consideration of the enormity of the potential financial settlement resulting from litigation, a more favorable contingency fee schedule has not been extended to the Commonwealth and there is no cap on the total amount of fees to be paid to the contractor." The letter then explained, "By disapproving this contract, the committee was merely exercising its statutory oversight duties in an attempt to protect taxpayer dollars."

On January 16, 2018, before Secretary Landrum took any action regarding the letter, the OAG filed this declaratory judgment action in Franklin Circuit Court. The OAG sought the following relief, as specified in its complaint:

I. That this Court issue a declaration and order that:

    A. the Attorney General's contracts for legal services are exempt from review by the Finance and Administration Cabinet and Government Contract Review Committee, pursuant to KRS 15.100(3), KRS 45A.700(1), and the Kentucky Constitution;

    B. the Government Contract Review Committee's disapproval of the Contract is null and void;

    C. any attempt by Secretary Landrum to cancel or otherwise interfere with the Contract is null and void; and

    D. in the alternative, the review of the Contract was clearly erroneous, arbitrary and capricious, and contrary to law, in violation of the Model Procurement Code.

The OAG also sought a permanent injunction, essentially preventing the LRC and the Secretary from "interfering" with this contract with the Morgan & Morgan team and any future contract for outside representation the OAG may make.

On January 18, 2018, Secretary Landrum notified the OAG, the LRC, the Committee, and the Morgan & Morgan team that he "will not overrule the decision to disapprove the contract." He also stated, "for all of the reasons raised by the Committee, I have determined that the contract is canceled pursuant to KRS 45A.705(6)(b)."

Both parties filed motions for summary judgment in the declaratory-judgment action. The trial court granted the OAG basically all the relief it

4

sought. Secretary Landrum then filed a Notice of Appeal and Motion for Emergency Relief in the Court of Appeals. After the Court of Appeals denied Secretary Landrum's Motion for Emergency Relief, Secretary Landrum sought to transfer the case to this Court, which we granted.

## II. ANALYSIS.

### A. The constitutional authority of the Attorney General to enter into a contingency-fee contract with outside counsel is subject to the overriding authority of the General Assembly.

The Kentucky Constitution names the Attorney General as a constitutional state officer and prescribes his or her powers. Section 91 of the Kentucky Constitution states: "A[n] . . . Attorney-General[] shall be elected by the qualified voters of the State[.] . . . The duties of [the Attorney General] *shall be such as may be prescribed by law*[.]"[3] Section 93 of the Kentucky Constitution provides further guidance on the power of the Attorney General: "The duties and responsibilities of [the Attorney General] *shall be prescribed by law*[.]"[4] Sections 91 and 93 make clear that the Attorney General's power extends only so far as what the law prescribes. And since "[t]he Legislature makes the laws,"[5] the General Assembly is the body that outlines the power of the Attorney General.

That the Attorney General's power is essentially completely governed by the General Assembly is a concept made clear by former Chief Justice Palmore

---

[3] (emphasis added).

[4] (emphasis added).

[5] *Sibert v. Garrett*, 246 S.W. 455, 463 (Ky. 1922).

5

in *Brown v. Barkley*: "The officers named in Const. Sec. 91 [e.g., the Attorney General] have no powers or duties not assigned to them by statute, except for . . . the common-law prerogatives of the Attorney-General that have not been removed or diminished by statute."[6] This Court expounded further on this principle in *Johnson v. Commonwealth ex rel. Meredith*:

> In conclusion, we are of opinion that, while the Attorney General possesses all the power and authority appertaining to the office under common law and naturally and traditionally belonging to it, nevertheless the General Assembly may withdraw those powers and assign them to others or may authorize the employment of other counsel for the departments and officers of the state to perform them. This, however, is subject to the limitation that the office may not be stripped of all duties and rights so as to leave it an empty shell, for, obviously, as the legislature cannot abolish the office directly, it cannot do so indirectly by depriving the incumbent of all his substantial prerogatives or by practically preventing him from discharging the substantial things appertaining to the office.[7]

What we can definitively say as it pertains to the present case: Whatever the breadth of the constitutional power of the Attorney General to enter into a contingency-fee contract with outside counsel may be, that power gives way to the overriding authority of the General Assembly.

Other jurisdictions honor this principle, as well. "An attorney general has the authority to appoint special private counsel in actions or proceedings instituted in the attorney general's name, including the authority to hire private counsel in a civil action on a contingency fee basis, *in the absence of a*

---

[6] *Brown v. Barkley*, 628 S.W.2d 616, 624 (Ky. 1982).

[7] 165 S.W.2d 820, 829 (Ky. 1942); *see also Commonwealth v. Johnson*, 423 S.W.3d 718, 725 (Ky. 2014) ("Although the General Assembly may limit the authority of the OAG, which is a part of the executive branch of government, it may not remove the fundamental characteristics of the office, 'so as to leave an empty shell.'").

6

*statutory prohibition.*"[8] Moreover, "When a statute governs the conditions to be met and the procedure to be followed for obtaining outside counsel, *the attorney general must follow the procedural requisites in doing so.*"[9]

In sum, regardless of any inherent constitutional authority of the Attorney General to enter into a contingency-fee contract with outside counsel, the Kentucky Constitution explicitly limits that authority to the will of the General Assembly. We must determine the General Assembly's will on this issue as expressed through its pertinent statutes.

## B. The oversight process of the MPC applies to the contract at issue here.

Since we have determined that the General Assembly has full power over the OAG's ability to enter into contingency-fee contracts with outside counsel, we next examine whether the General Assembly has exercised that power.

---

[8] Lonnie E. Griffith, Jr., 7A C.J.S. *Attorney General* § 7, Authority of state attorneys general—Private attorneys on fee basis (Mar. 2019 update) (emphasis added) (citing *State v. Hagerty*, 580 N.W.2d 139, 147 (N.D. 1998) ("In view of this long-standing acceptance of contingent fee arrangements and in view of the historical authority of the Attorney General, we believe she has the authority to employ special assistant attorneys general on a contingent fee agreement *unless such agreements are specifically prohibited by statute.*") (emphasis added); (*State ex rel. Discover Financial Services, Inc. v. Nibert*, 744 S.E.2d 625, 647 (W. Va. 2013) ("[U]nder Article VIII, Section 13 [of the West Virginia Constitution], *the Legislature can expressly repeal specific aspects of the Attorney General's inherent common law powers.*") (emphasis added); (*Meredith v. Ieyoub*, 700 So.2d 478, 482 (La. 1997) ("As the constitution does not expressly give the Attorney General the financial power to hire and pay outside attorneys on a contingency fee basis, *we now look to statutory law to see if the Legislature has granted him this power under the Legislature's legislative power.*"); *see also*, Marie K. Pesando, 7 Am. Jur. 2d *Attorney General* § 4, Compensation of assistants and special counsel (Feb. 2019 update) ("[T]he attorney general has authority to employ special assistant attorneys general on a contingent fee agreement *unless such agreements are specifically prohibited by statute*[.]" (emphasis added)) (citing *Hagerty*, 580 N.W.2d at 139).

[9] Griffith, *supra* note 8 (emphasis added) (citing *Philip Morris Inc. v. Gladening*, 709 A.2d 1230 (Md. 1998)).

Secretary Landrum and the Attorney General identify seemingly competing statutes on this issue.

KRS 15.100(3) states, '[T]he Attorney General may enter into such contracts for legal services as he deems necessary and advisable."[10] So the General Assembly has broadly given the Attorney General the power to enter into whatever contracts he or she deems necessary and advisable.

But this ability, if the General Assembly so desires, could still be subject to the MPC. KRS 15.100(3) does not exempt the OAG's contracts from the provisions of the MPC; rather, the function of that statute is legislative recognition that the OAG can enter into contracts, including contracts for legal services. But recognizing the power of the OAG to do something is not the same as providing the OAG complete and unfettered control over that power. Secretary Landrum quotes in his brief how a former attorney general of this state described, in a brief to a federal court, the relationship between KRS 15.100(3) and the MPC: "KRS 15.100(3) *authorizes* the retention of outside counsel by the Attorney General. *The manner* in which such retention is made is governed by KRS 45A.695, the state bidding process."[11]

---

[10] We note that after the inception of the case at hand, the General Assembly amended this statute to include the following, which immediately follows the quoted language: "Such contracts shall be subject to the relevant provisions of the Kentucky Model Procurement Code in KRS Chapter 45A." This explicit legislative clarification all but negates the OAG's argument in future contracts that the LRC and Secretary Landrum cannot assert any control over the OAG's entering into contingency-fee contracts with outside counsel.

[11] Defendant's Memorandum of Law in Opposition to Merck's Motion for Preliminary Injunction at 27, *Merck Sharp & Dohme Corp. v. Conway*, 909 F.Supp. 2d 781 (E.D. Ky. 2012) (Civil Action No. 3:11–CV–00051–DCR) (emphasis added).

8

This significant distinction is brought into focus by the fact that other state agencies are also authorized by statute to enter into contracts they deem "necessary and advisable."[12] The General Assembly's recognition of the power of these agencies to enter into contracts cannot be interpreted as exempting those agencies from MPC oversight. Otherwise, a gaping loophole exists in the MPC, making it is questionable whether *any* state agency's contracting is subject to the MPC mechanism. Recognizing this distinction in the statutes offered up on both sides of the present case, it is our role to harmonize the law to give meaningful effect to both statutes[13] in furtherance of the General Assembly's intent in enacting them.[14]

The MPC creates a government-oversight mechanism over certain government actors' entering into of certain contracts. KRS 45A.020(1) provides the general rule for application of the MPC: "This code shall apply to every expenditure of public funds by this Commonwealth under any contract or like business agreement."[15] KRS 446.010(41) defines "public funds" to "mean[]

---

[12] *See, e.g.*, KRS 156.070(3)(c) ("The Kentucky Board of Education . . . may enter into one (1) or more contracts[.]"); KRS 353.756(7) ("[T]he [Kentucky Gas Pipeline Authority] may: Enter into contracts with parties that are necessary and incidental to the performance of its duties and execution of its powers[.]"); KRS 211.820(1)(h) ("The Cabinet for Health and Family Services shall have the following functions, power, and duties: To enter into such contracts and agreements . . . as may be deemed necessary and advisable to carry out the general intent and purposes of this section.").

[13] "[I]t is the Court's duty to harmonize the law so as to give effect to both statutes." *Commonwealth v. Phon*, 17 S.W.3d 106, 107-08 (Ky. 2000).

[14] "All statutes of this state shall be liberally construed with a view to promote their objects and carry out the intent of the legislature[.]" KRS 446.080(1).

[15] Just as it did with KRS 15.100(3), the General Assembly amended KRS 45A.020(1) after the inception of the contract between the OAG and Morgan & Morgan to include the following language: "This code shall apply to every expenditure of public funds by this Commonwealth *and every payment by contingency fee under any contract or like business agreement*[.]" (emphasis added). Just as before, this legislative clarification all but negates the OAG's argument that the LRC and Secretary Landrum cannot assert

9

sums actually received in cash or negotiable instruments from all sources unless otherwise described by any state agency . . . or any other form of organization whether or not the money has ever been paid into the Treasury and whether or not the money is still in the Treasury if the money is controlled by any form of state organization[.]"

So we must determine whether the contingency-fee contract at issue here constitutes "an expenditure of public funds[,]" "public funds" meaning "sums actually received." To assist us in our statutory interpretation, we note the following duty this Court has in so doing:

> In interpreting a statute, this Court must be guided by the intent of the legislature in enacting the law. No single word or sentence is determinative, but the statute as a whole must be considered. In order to effectuate the legislative intent, words may be supplied, omitted, substituted or modified. The purpose is to give effect to the intent of the legislature. KRS 446.080 provides that all statutes shall be liberally construed to carry out the intent of the legislature.[16]

We explained the nature of a contingency-fee contract in *First Nat. Bank of Louisville v. Progressive Cas. Ins. Co.*:

> Contingent fee contracts owe their very existence to the principle that *the attorney does not gain any share in the title of the thing he has engaged himself to recover.* It was the law in England and has been the law in this state from time immemorial that "an agreement to aid in a suit, and then divide the thing recovered" is champertous and void. An agreement to measure an attorney's fee by the value of what is recovered is valid only upon the theory that the client "is not to give a part or profit of the thing in contest." . . .
>
> It is customary for insurance companies, as well as others against whom claims for money are asserted, to make a settlement draft

---

any control over the OAG's entering into contingency-fee contracts with outside counsel in contracts entered into after the General Assembly's addition of that language.

[16] *County. of Harlan v. Appalachian Reg'l Healthcare, Inc.*, 85 S.W.3d 607, 611 (Ky. 2002) (internal citations omitted).

payable to the claimant and his attorney. That is for the protection of the lawyer and for the protection of the payor against a claim by the lawyer that he was dealt around and divested of his lien. *It gives him no real ownership interest, since he is not entitled to a fee for money collected until he delivers it over to his client. Only then does the client owe him anything.* And it is no answer to say that [the attorney] had a lien on the proceeds of the draft. The bank had no more of a right to pay him off separately than would [the losing party]. . . . The stubborn fact is that *[the attorney] did not have any ownership or other interest in these drafts that would entitle him to collect upon them independently of his clients, who were the owners.*[17]

Before the Morgan & Morgan team can recover for its work on behalf of the Commonwealth, the Commonwealth must "actually receive[]" any and all "sums" of money recovered through the lawsuit. Not only is this mandated by common law, but it is also mandated by the contract in this case: "Prior to accepting a monetary recovery on behalf of the Commonwealth, Contractor shall advise the Court of the statutory requirements of KRS 48.005(3) mandating that the total monetary recovery be paid directly to the Commonwealth and deposited in the State Treasury."

Any sum recovered in the OAG's lawsuit will be "actually received" by the Commonwealth, making that whole sum "public funds." The Commonwealth will then use a portion of these "public funds" to pay the Morgan & Morgan team for professional services rendered. Unquestionably, this an "expenditure of public funds." As such, the MPC applies to the contract at issue here.

The OAG argues that the possibility that recovery could be nothing, meaning that the Commonwealth would not "actually receive[]" any "sums," exempts the contract from application of the MPC. This argument bleeds into

---

[17] 517 S.W.2d 226, 230 (Ky. 1974) (internal citations omitted) (emphasis added).

11

the OAG's additional argument that even if the MPC applies to the contract at issue here, KRS 45A.700 does as well. And KRS 45A.700(1) provides, "Personal service contracts in aggregate amounts of ten thousand dollars ($10,000) or less during any one (1) fiscal year shall be exempt from routine review by the committee and shall be filed with the committee not more than thirty (30) days after their effective date for informational purposes only." The OAG argues that although the contingency-fee contract could amount to a contract worth much more than $10,000, it could also amount to nothing. Because of this potential of no recovery, the contract falls within the $10,000-or-less exemption of KRS 45A.700, so the OAG argues.

Accepting the OAG's argument would circumvent the purpose of the MPC. KRS 45A.010(2) defines some of the purposes of the MPC to include:

> (d) To provide for increased public confidence in the procedures followed in public procurement;
>
> (e) To insure the fair and equitable treatment of all persons who deal with the procurement system of the Commonwealth;
>
> (f) To provide increased economy in state procurement activities by fostering effective competition; and
>
> (g) To provide safeguards for the maintenance of a procurement system of quality and integrity.

Allowing any governmental entity to avoid the MPC's process for the procurement of a government contract by structuring its contract on some sort of contingency basis could effectively nullify application of the MPC. It would seem absurd to think that the General Assembly intended for contracts entered into on a contingency basis that could be worth millions of dollars of public

12

money to be exempted from government oversight simply because of the possibility that they could be worth nothing.[18]

Moreover, a helpful secondary source terms KRS 45A.700(1) a "purchasing threshold statute."[19] "The main purpose of establishing purchasing thresholds is to identify a dollar amount for requiring competition for government contracts."[20] So the inclusion of a purchasing threshold statute indicates an exemption from the requirement of competition for government contracts more so than it indicates a wholesale exemption from the application of the entire MPC. Furthermore, requiring competition for government contracts is one of the purposes of the MPC, as expressed by KRS 45A.010(2)(f). Considering the potential multi-million-dollar recovery at stake, coupled with the pervasiveness of the opioid-abuse epidemic in Kentucky, forcing a competition among law firms for this contract would seem to further many of the General Assembly's purposes in enacting the MPC. It would seem at odds with the purposes of the MPC to exempt contingency-fee contracts from the government-review mechanism.

Finally, the OAG points to language in the General Assembly's 2016 budget bill to support his argument that the MPC is no impediment to the

---

[18] "We have a duty to accord to words of a statute their literal meaning unless to do so would lead to an absurd or wholly unreasonable conclusion." *Cosby v. Commonwealth,* 147 S.W.3d 56, 59 (Ky. 2004) (quoting *Bailey v. Reeves,* 662 S.W.2d 832, 834 (Ky. 1984)).

[19] Thomson Reuters, *50 State Statutory Surveys,* 0095 Surveys 4, Government: Government Contracts, Purchasing Thresholds (Feb. 2018).

[20] *Id.*

OAG's ability to enter into contingency-fee contracts with outside counsel. The General Assembly included the following language in that budget bill:

> The Office of the Attorney General may present proposals to state agencies specifying legal work that is presently accomplished through personal service contracts that indicate the Office of the Attorney General's capacity to perform the work at a lesser cost. State agencies may agree to make arrangements with the Office of the Attorney General to perform the legal work and compensate the Office of the Attorney General for the legal services. Notwithstanding KRS Chapter 45A, the Office of the Attorney General may contract with outside law firms on a contingency basis.[21]

The OAG points to the last sentence of that paragraph in support of its argument that the MPC does not apply to the contract at issue here.

But the OAG misconstrues the application of the phrase "notwithstanding KRS Chapter 45A," more specifically, the term *notwithstanding*. As the OAG notes, the U.S. Supreme Court defines *notwithstanding* to mean "in spite of" or "without prevention or obstruction from or by."[22] Here, "[n]otwithstanding KRS Chapter 45A" means that KRS 45A cannot be interpreted in a way to negate the OAG's ability to contract with outside law firms on a contingency-fee basis. But the ability to contract with outside law firms on a contingency-fee basis and the right to do so without government oversight are two different and distinct rights, as discussed in conjunction with our analysis of the relationship between KRS 15.100(3) and the MPC.

---

[21] 2016 Ky. Acts Ch. 149 § 1, Part I(A)(19)(3).

[22] *N.L.R.B. v. SW General, Inc.*, 137 S.Ct. 929, 939 (2017) (internal citations omitted).

Although the MPC cannot be interpreted to suggest that the OAG has no ability to enter into a contingency-fee contract with outside counsel, the sentence upon which the OAG relies cannot be interpreted to function as an affirmative exemption from the application of the MPC's government-oversight mechanism. In other words, the use of the word *notwithstanding* is a shield but not a sword—while the MPC cannot be construed to say that the OAG has no power to enter into contingency-fee contracts with outside counsel, that right of the OAG is still subject to the oversight mechanism of the MPC. Again, stated differently, "notwithstanding KRS Chapter 45A" does not preclude application of the MPC, it simply precludes construing the MPC to say that the OAG has no ability to enter into contingency-fee contracts with outside counsel.

Moreover, "[g]eneral principles of statutory construction hold that a court must not be guided by a single sentence of a statute but must look to the provisions of the whole statute and its object and policy."[23] Considering the entirety of the above-cited paragraph, that portion of the budget bill refers to the ability of the OAG to contract with outside law firms for work done *on behalf of other state agencies*. The contract at issue here is beyond the scope of any purported exemption stated in the budget bill and championed by the OAG because the OAG contracted with the Morgan & Morgan team to assist *it in its own lawsuit.*

Additionally, we agree with Secretary Landrum's position that the General Assembly "does not alter the fundamental details of a regulatory

---

[23] *County of Harlan*, 85 S.W.3d at 611 (citing *Democratic Party of Ky. v. Graham*, 976 S.W.2d 423 (Ky. 1998)).

scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."[24] If the General Assembly truly wished to allow the OAG completely to escape the regulatory mechanism of the MPC, it would have explicitly so indicated in the particular statutes that more specifically govern this situation, i.e., KRS 15.100(3) or some portion of KRS 45A. One sentence in a paragraph about doing work on behalf of other agencies, located in a budget bill and not in the specific statutes governing this subject matter, does not convince us that the General Assembly intended to exempt the OAG from the safeguards of the MPC.

Finally, we cannot accept the OAG's position that allowing the Committee and Secretary Landrum to reject or cancel any contract between the OAG and an outside law firm would render the OAG an "empty shell." Nothing in the MPC precludes the OAG from bringing this suit on behalf of the Commonwealth itself. Time and again, the OAG has proven itself capable of handling complex legal matters using the resources the Commonwealth provides it.

We are satisfied that the OAG's contract with the Morgan & Morgan team at issue here is subject to the MPC. Allowing governmental entities to escape application of the MPC by structuring their contracts with private entities on a contingency-fee basis would circumvent the purposes of the MPC, a result that we simply cannot accept as intended by the General Assembly. And applying the MPC to the OAG's entering into contingency-fee contracts with private counsel would not reduce that office to "empty shell."

---

[24] *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (citations omitted).

16

## C. The LRC and Secretary Landrum did not arbitrarily reject the contract in violation of Section 2 of the Kentucky Constitution.

Lastly, the OAG argues that even if the contract is subject to the provisions of the MPC, the contract should remain in effect because the Committee and Secretary Landrum acted arbitrarily and capriciously in rejecting and cancelling it.

At the outset, the parties and the trial court appear to be confused about the standard by which courts review this issue.[25] Among the ways the trial court and parties urge review of this issue, they have identified the general rule that usually guides the judiciary's review of administrative agency decisions, the arbitrary and capricious standard: "Judicial review of an agency decision is limited to the determination of whether the decision was arbitrary, i.e., whether the action was taken in excess of granted powers, whether affected parties were afforded procedural due process, and whether decisions were supported by substantial evidence."[26] "As an appellate court, we stand in the shoes of the circuit court and review the [agency's] decision for arbitrariness."[27]

Normally, a court reviews an agency's decision for arbitrariness in the three ways described in *Louisville Metro*. But our review is modified by the

---

[25] The trial court suggested that KRS 45A.015(2) outlines the standard for review. This statute provides, "Every contract or duty under this code shall impose an obligation of good faith in its performance or enforcement." The trial court is mistaken on this point because that statute speaks to the duties of the contracting parties, not the duty of the Committee and Secretary Landrum to review contracts.

[26] *Louisville Metro Health Dept. v. Highway Manor Ass'n, LLC*, 319 S.W.3d 380, 383 (Ky. 2010) (quoting *Sebastian-Voor Props., LLC v. Lexington-Fayette Urban Cty. Gov't*, 265 S.W.3d 190, 195 (Ky. 2008)).

[27] *Martin Cty. Home Health Care v. Cabinet for Health & Fam. Servs.*, 214 S.W.3d 324, 326 (Ky. App. 2007) (citing *Am. Beauty Homes Corp. v. Louisville and Jefferson Cty. Planning and Zoning Comm'n*, 379 S.W.2d 450 (Ky. 1964)).

circumstances of this case, and the U.S. Supreme Court's decision in *Citizens to Preserve Overton Park v. Volpe*[28] is particularly helpful to us.

At issue in *Volpe* was the Secretary of Transportation's authorization of the use of federal funds to finance the construction of a highway through a public park.[29] The Secretary of Transportation's power to do this stemmed from a statute "provid[ing] that the Secretary 'shall not approve any program or project' that requires the use of any public parkland 'unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park[.]'"[30] A host of parties challenged the Secretary of Transportation's authorization, requiring the U.S. Supreme Court to determine how to review such a challenge.[31]

The challengers argued for the application of the substantial-evidence standard of review. The U.S. Supreme Court explicitly rejected reviewing the Secretary of Transportation's decision under the substantial-evidence test:

> *Review under the substantial-evidence test is authorized only when the agency action is taken pursuant to a rulemaking provision of the Administrative Procedure Act itself, or when the agency action is based on a public adjudicatory hearing.* The Secretary's decision to allow the expenditure of federal funds to build I-40 through Overton Park was plainly not an exercise of a rulemaking function. And the only hearing that is required by either the Administrative Procedure Act or the statutes regulating the distribution of federal funds for highway construction is a public hearing conducted by local officials for the purpose of informing the community about the proposed project and eliciting community views on the design and route. *The hearing is non-adjudicatory, quasi-legislative in*

---

[28] 401 U.S. 402 (1971) (abrogated only on the rule that the Administrative Procedure Act provides an independent grant of subject-matter jurisdiction to courts in reviewing agency action by *Califano v. Sanders*, 430 U.S. 99 (1977)).

[29] *Volpe*, 401 U.S. at 407.

[30] *Id.* at 411 (citations omitted).

[31] *Id.* at 415.

> *nature. It is not designed to produce a record that is to be the basis of agency action—the basic requirement for substantial-evidence review.*[32]

*Volpe* is helpful because it identifies three types of agency action: (1) rulemaking; (2) adjudicatory hearings; and (3) non-adjudicatory, quasi-legislative hearings. Although the substantial-evidence test is the appropriate standard of review when determining an agency's action stemming from rulemaking or adjudicatory hearings, as the Court in *Volpe* instructs, that test is not the appropriate standard of review of an agency's action stemming from a non-adjudicatory, quasi-legislative hearing because such a hearing is not designed to produce a record for review.

We must now determine the type of agency action at issue in this case. KRS 45A.705 outlines the process for the Committee and Secretary Landrum's review of the propriety of the contract already entered into by an entity of the Commonwealth. Subsection (1) of that statutes creates the "Government Contract Review Committee[,]" which, under Subsection (2) meets monthly to perform the duties outlined under Subsection (4):

> All proposed personal service contracts . . . received by the [LRC] shall be submitted to the [Government Contract Review Committee] to:
>
> (a) Examine the stated need for the service or benefit to the Commonwealth . . . [;]
>
> (b) Examine whether the service could or should be performed by state personnel, for personal service contracts . . . [;]
>
> (c) Examine the amount and duration of the contract or agreement; and

---

[32] *Id.* at 414–15 (emphasis added).

>   (d) Examine the appropriateness of any exchange of
>   resources or responsibilities.

Subsection (5) provides, "If the committee determines that the contract service or agreement . . . is not needed or inappropriate, . . . the service could or should be performed by state personnel, the amount or duration is excessive, or the exchange of resources or responsibilities are inappropriate, the committee shall attach a written notation of the reasons for its disapproval or objection to the personal service contract . . . and shall return the personal service contract . . . to the secretary of the Finance and Administration Cabinet[.]" Finally, KRS 45A.705(6) then provides:

>   Upon receipt of the committee's disapproval or objection to a
>   personal service contract, . . . the secretary of the Finance and
>   Administration Cabinet . . . shall determine whether the personal
>   service contract . . . shall:
>
>   (a) Be revised to comply with the objections of the committee;
>
>   (b) Be canceled and, if applicable, payment allowed for
>   services rendered under the contract or amendment; or
>
>   (c) Remain effective as originally approved.

The Committee reviews the propriety of the contract entered into between the government entity and the private actor, rendering either approval or disapproval of the contract. The Committee then submits its recommendation to the Finance and Administration Cabinet, i.e., the Secretary, who orders the contract to be revised, cancelled, or effective as originally approved. There is nothing about the process outlined in KRS 45A.705 that involves "rulemaking," i.e., the promulgation of administrative regulations.[33] Nor does the KRS

---

[33] *See* KRS 13A.120.

45A.705 process involve adjudication and an adversarial hearing.[34] Rather, the KRS 45A.705 process constitutes a non-adjudicatory, quasi-legislative hearing akin to the type of proceeding at issue in *Volpe*. We must determine the applicable standard of review in this case.

The OAG does not argue that it was denied procedural due process at any point. And while the OAG argues that the Committee and Secretary Landrum's actions taken in this process "w[ere] taken in excess of granted powers[,]" the OAG's basis for this argument is that the MPC does not apply to the contract. But we have already rejected this argument and found that the MPC does indeed apply to the contract at issue in this case. Finally, we cannot apply the substantial-evidence test because, per *Volpe*, the application of that kind of review is inappropriate.

Instead, *Volpe* defines the standard of review this Court will apply in its review of non-adjudicatory, quasi-legislative agency determinations, which is still a review for arbitrariness and capriciousness, but defined in the following way: "To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The Court is not empowered to substitute its judgment for that of the agency."[35] To be clear,

---

[34] *See* KRS 13B.080.

[35] *Volpe*, 401 U.S. at 416 (internal citations omitted).

21

"the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."[36]

In the LRC's letter to Secretary Landrum and the OAG, the Committee's reasons for disapproving the contract are stated thus: "The committee is concerned, in consideration of the enormity of the potential financial settlement resulting from litigation, a more favorable contingency fee schedule has not been extended to the Commonwealth and there is no cap on the total amount of fees to be paid to the contractor." These two reasons for disapproving the contract were discussed at the Committee's hearing on the contract, as well. Secretary Landrum ultimately agreed with the Committee in his letter: "The Committee's concerns are well-taken, and I will not overrule the decision to disapprove the contract. Accordingly, and for all the reasons raised by the Committee, I have determined that the contract is canceled pursuant to KRS 45A.705(6)(b)."

Per KRS 45A.705(5), it is within the Committee's prerogative to "determine[] that the contract service or agreement . . . is not needed or inappropriate, . . . the amount or duration is excessive, or the exchange of resources or responsibilities are inappropriate[.]" While we remain skeptical of the basis in reality for of the Committee's belief that a more favorable contingency-fee could have been contracted for, the Committee's consideration of that factor constitutes nonetheless a "relevant factor" for consideration. Additionally, the contract does indeed fail to include a cap on the total amount of fees to be paid to the contractor. Placing a cap on the amount of fees

---

[36] *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

22

obtained by outside counsel to maximize any potential recovery for the Commonwealth also constitutes a "relevant factor[]" considered by the Committee and Secretary Landrum in their ultimate decision. And we cannot say that the Committee and Secretary Landrum committed a "clear error of judgment" in deciding to cancel the contract based on the contract's failure to maximize any potential recovery for the Commonwealth.

Simply put, the Committee and Secretary Landrum considered relevant factors and decided to cancel the contract based on those factors, making it impossible for a reviewing court to say that the decision to cancel was a "clear error of judgment." We find that the Committee and Secretary Landrum did not act arbitrarily in deciding to cancel the contract between the OAG and the Morgan & Morgan team.

### III. CONCLUSION.

We reverse the judgment of the Franklin Circuit Court and remand this case to that court with directions to enter judgment in favor of Secretary Landrum.

All sitting. Minton, C.J.; Buckingham, Lambert, VanMeter and Wright, JJ., concur. Hughes concurs by separate opinion, in which Keller, J., joins. Keller, J., concurs by separate opinion.

HUGHES, J., CONCURRING: I concur in the majority's well-reasoned analysis but write separately due to factors in the record that, absent a change in circumstances, would lend credence to the Attorney General's argument that the Committee's action disapproving the contingency-fee contract was arbitrary. Given the representations of counsel for Secretary Landrum at oral

23

argument that the particularly concerning factor (a competing RFP from the Justice Cabinet) "was withdrawn" and given the Committee's ultimate focus on the perceived unfavorable contingency fee terms and absence of a cap on the legal fees as grounds for disapproval, I can concur that the Committee and Secretary Landrum did not act arbitrarily. The concerning factors, nonetheless, bear further comment.

KRS 45A.010(2) makes clear that the Model Procurement Code, in addition to assuring the responsible expenditure of state funds, is intended to increase "public confidence" in purchasing procedures; to "insure the fair and equitable treatment of all persons who deal" with the MPC; and "to provide safeguards for the maintenance of a procurement system of quality and integrity." Those goals are paramount and every person involved in the MPC process should be guided by them and not by partisan concerns.

The record reflects that the OAG followed Finance Cabinet guidance in creating a review panel that considered responses from seventeen different law firms to the RFP for legal services necessary to pursue opioid product litigation. After the highest scoring firm was chosen by a four-person review panel, the proposed contract was submitted to the Finance Cabinet on September 21, 2017. For the next three months, the OAG and Cabinet staff went back and forth regarding revisions. On December 21, 2017, the Cabinet staff approved the third version of the contract which the OAG had revised to meet all of the Cabinet's requests.

Then the Legislative Research Commission Government Contract Review Committee met on January 9, 2018 to address the contract. In response to

24

Committee members' questions regarding the fee structure, an OAG representative noted it was based on language from a House Bill in the last legislative session and was less generous than previous contingency fee structures. While members raised understandable and legitimate concerns regarding issues with prior contingency fee contracts, one member notably referenced a competing RFP from the Justice Cabinet. The record contains that draft RFP from the Justice and Public Safety Cabinet with a projected issue date of January 29, 2018, twenty days after the Committee meeting and months after the OAG RFP was public and the Cabinet staff had approved the OAG's proposed contract with a team of law firms. As the Attorney General states, "the Justice Cabinet RFP borrowed the terms of the OAG RFP and contract nearly word for word."[37] Obviously, at least one member of the Committee was privy to the fact that the Justice Cabinet was seemingly planning to preempt the OAG and pursue the opioid product litigation itself.

If the OAG contract was disapproved to make way for the Justice Cabinet to step in with its competing RFP and take the Attorney General's place, it would raise a host of issues including *inter alia* impeding the authority of the Attorney General and depriving Kentuckians of certain legal remedies that can be pursued only by the Commonwealth's chief legal officer. It would also render the Committee's decision arbitrary; the alleged contract term reasons for

---

[37] Notably, the Justice Cabinet's RFP also did not have a cap on the legal fees, one of the two objections raised by the Committee, and the fee structure was not significantly different than that in the OAG RFP and contract.

25

disapproval would be pretextual.[38] Given counsel's assurance that the Justice Cabinet is no longer pursuing the competing RFP[39] and the identification of legitimate concerns that the Commonwealth receive "a more favorable contingency fee schedule"[40] and that a legal fee cap be included, I can concur.

Keller, J., joins.

KELLER, J., CONCURRING: In this case, the majority has concluded that the General Assembly "completely govern[s]" the Attorney General's power. The majority acknowledges that this control is "subject to the limitation that the office may not be stripped of all duties and rights so as to leave it an empty shell." *Johnson v. Commonwealth ex rel. Meredith*, 165 S.W.2d 820, 829 (Ky. 1942). Nevertheless, the majority concludes that the Secretary's ability to reject or cancel the Attorney General's contracts under the MPC does *not* leave that office as an empty shell because "[t]ime and again, the OAG has proven itself capable of handling complex legal matters using the resources the Commonwealth provides it." I find this language somewhat troubling. The determination that outside counsel is necessary to pursue complex litigation is best left to the Attorney General, the chief law enforcement officer of the Commonwealth, and the OAG's previous reliance on its own staff should not in

---

[38] It is noteworthy that concerns about the contingency fee structure and absence of a legal fee cap apparently had never been raised in the months of interaction between the OAG and Cabinet staff.

[39] The Secretary's reply brief also states: "the RFP discussed on p. 38 [of the Attorney General's brief] was not approved by the Secretary (because contracts, not RFPs, are approved by the Secretary) and neither was a contract ever entered for the RFP."

[40] As Chief Justice Minton writes, I too am "skeptical of the basis in reality for the Committee's belief that a more favorable contingency-fee could have been contracted for. . . ." Nonetheless, without more of a record on this issue, I cannot conclude the Committee's concern is unfounded.

26

any way hamper its ability to seek outside help in the future. This is especially true in highly complex matters of public importance, like the litigation against the opioid manufacturers.

In this case, the Attorney General determined that the office needed the assistance of outside legal counsel in handling this complex litigation. It then proceeded through a thorough vetting process. The process involved the issuance of an RFP, to which seventeen law firms responded with proposals. A review panel then reviewed and scored the proposals. Morgan & Morgan PLLC received the highest technical score, and according to Deputy Attorney General Brown, its proposed recovery rates were among the lowest ever produced in this state for a contingency-fee case of this type. The OAG then prepared a contingency-fee contract, which it submitted to the Cabinet on September 21, 2017. Over the next several months, the proposed contract floated back and forth between the OAG and the Cabinet. During that time, the Cabinet twice rejected the proposed contract language, and the OAG complied with the Cabinet's suggested edits each time. The Cabinet ultimately approved the OAG's third version of the contract and submitted it to the Committee. Nevertheless, the Committee disapproved the contract, which was then canceled by the Secretary.

In reviewing the decision to cancel the contract, we were limited by the narrow standard of review applicable to non-adjudicatory, quasi-legislative proceedings: "whether the decision was based on a consideration of the relevant factors and whether there was a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971) (citations omitted).

27

Because we concluded that the Committee and Secretary Landrum considered relevant factors, we could not find that their decision to cancel the contract constituted a "clear error of judgment."

My concern is that the Secretary or a similarly-situated official, emboldened by the narrow standard of review recited above and practically unfettered discretion afforded to his position, could reject or cancel a similar carefully drafted contingency-fee contract for outside counsel having considered nothing more than this Court's own statement that "[t]ime and again, the OAG has proven itself capable of handling complex legal matters using the resources the Commonwealth provides it." I therefore write separately to express my opinion that the OAG's use of its own staff in past litigation, even complex litigation, without more, should be irrelevant to the Secretary's decision to reject or cancel a proposed contract for outside legal services. In other words, it should not qualify as a "relevant factor" under this standard of review.

COUNSEL FOR APPELLANT:

Mark Stephen Pitt
Stephen Chad Meredith
Berry Lee Dunn
Matthew Kuhn
Office of the Governor

Brett Nolan
Office of the General Counsel

COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

John Michael Brown
La Tasha Arnae Buckner
Steven Travis Mayo
Laura Tipton
Taylor Allen Payne
Marc Farris
Office of the Attorney General